In re **POIRIER & GRAVEL ENTERPRISES, INC., a Florida corporation, Debtor.**

**POIRIER & GRAVEL ENTERPRISES, INC., a Florida corporation, Plaintiff/Debtor,**

v.

**Ludovit NANAK, Janet Nanak, Marc Ali Blouin, and Atlantic Realty Corporation, a Florida corporation, Defendants.**

**Bankruptcy No. 92–22481–BKC–SMW.**
**Adv.Proc. No. 92–1208–BKC–SMW–A.**

United States Bankruptcy Court, S.D. Florida.

June 7, 1993.

Neil J. Berman, Miami, FL, for defendants.

Daniel E. Oates, Pompano Beach, FL, for plaintiff.

## FINAL JUDGMENT FOR ALL DEFENDANTS ON ALL COUNTS

SIDNEY M. WEAVER, Chief Judge.

THIS MATTER was tried before the Court on April 12 and 19, 1993, and the Court, having observed the candor and demeanor of the witnesses, examined the exhibits placed into evidence, having heard the arguments of counsel and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law.

The business of the debtor, Poirier and Gravel Enterprises, Inc., is the operation of its principal asset, the Jasmin Villa Motel, located in Pompano Beach, Florida. This adversary proceeding was brought by the debtor to recover monies from, or at least to obtain an offset to, the secured proof of claim of Ludovit ("Louis") and Janet Nanak (the "Nanaks"), who hold the purchase money second mortgage on Jasmin Villa, and to obtain a money judgment from the broker and salesman representing the Nanaks in their sale of Jasmin Villa to the debtor. This court has jurisdiction of the matter pursuant to 28 U.S.C. § 1334. This is a core proceeding, 28 U.S.C. § 157(b)(2)(C) and (K), and resolves the debtor's objection to the Nanaks' secured claim. Pursuant to FRBP 7052, this Order shall also constitute the Final Judgment.

The debtor's complaint contains four counts against the Nanaks: Count I is for fraud and deceit; Count II is for breach of contract; Count III is for rescission and cancellation of the purchase money mortgage and note and Count IV is for civil theft. A fifth count is brought against the broker, Atlantic Realty and Best 100, Inc., and the salesman, Marc Blouin, alleging misrepresentation against them. The claims set forth in this adversary proceeding are identical to the ones which the debtor and Poirier filed in state court (Case Number 92–06587(07) in the 17th Judicial Circuit, Broward County, Florida), which case was stayed by this court's order dated November 16, 1992, which required the debtor to file this case against the Nanaks by November 19, 1992 in this Court, or be deemed to have waived any claim against them, and any objection to the Nanaks' secured claim. All transactions complained of herein occurred in the State of Florida. Florida law applies.

Generally, the debtor's complaint is that the Nanaks listed Jasmin Villa for sale in November 1989, and that the listing showed prior year income of $210,000, when in fact it was only $118,000, and that the listing showed that Jasmin Villa had 29 motel units, when in fact only 24 were authorized.

### Findings of Fact

In 1990, Francine Poirier, then a resident of Canada, sought to purchase income property in South Florida. In March 1990, she traveled to Florida for two weeks and, with a broker who is not a party hereto, viewed numerous motel properties that were for sale. Near the end of her two week stay, she called defendant Marc Blouin, to ask about other motel properties. Blouin did not meet with her before she left Florida, but he did agree to send her some information on motel properties available for sale in South Florida. After she returned to Canada, Poirier received a letter from Blouin generally discussing South Florida motels. With his letter were photocopies of the Multiple Listing Service book's descriptions of some twenty or so motel properties then available for sale in South Florida. One of the copies in the package described Jasmin Villa as a 29 unit motel, which had income in the prior year of $210,000, and which was offered for $1,195,000. Like all of the copies of the broker's listings sent to Poirier, the preprinted form contained a standard admonishment, "Information believed to be accurate, but not warranted."

During April or May 1990, Poirier contacted Blouin and made an appointment to visit with him during her anticipated two week stay in Florida in May 1990, during which she planned to continue to view prospective motel properties to buy.

Sometime after she arrived in Broward County in May, Poirier met with Blouin.

Blouin, a native French Canadian specializing in the sale of income properties to French Canadians, discussed with Poirier, in general terms, motel revenue and expense projections, on a per rental unit basis, which one might expect from operating a motel which caters to French Canadian tourists, which Poirier indicated she intended to do. A handwritten paper containing abstract, per unit profit and loss calculations for such properties, was introduced into evidence at trial. The document contained the handwriting of both Blouin and Poirier, in French. The testimony at trial was that the projections were prepared by Blouin and Poirier as they discussed the South Florida motel business in Blouin's office, before Blouin took Poirier to see any properties. Nowhere on the document is there an indication that the parties were referring to Jasmin Villa at the time the calculations were discussed. Indeed, the calculations do not appear to refer to the operation of Jasmin Villa by the Nanaks, who did not operate Jasmin Villa specifically for French Canadian tourists. In fact, the Nanaks, who come from the former Czechoslovakia, do not speak French, and their motel guests came principally from Europe. The parties all agreed that the French Canadian tourist market was a specialty niche that generally earned higher revenues and incurred higher expenses.

During her trip in May, 1990, Poirier telephoned numerous motels in the area to get a feel for market rental rates. She also visited Jasmin Villa during her trip, and met the Nanaks. Both Poirier and Louis Nanak testified that Poirier asked no questions of the Nanaks regarding income or expenses or the operation of Jasmin Villa. Their meeting consisted of little more than an introduction and exchange of pleasantries. Louis testified that he attempted to show the Nanaks' 1989 income tax return to Poirier, but she refused to look at it. Blouin testified that Poirier told him that in her real estate experience she does not rely upon sellers' representations of income, because she feels that all sellers distort their claimed income, and that only an independent judgment as to potential income and expenses should be relied upon.

Francine Poirier testified that for at least ten years before she sought income property in Florida, she had bought and sold numerous parcels of investment real estate in Canada, and that she developed, rehabilitated, and managed commercial and residential income property. In May 1990, she testified she had an investment portfolio containing more than $3 million in Canadian income properties. She also had experience as a lecturer in finance, and as a bank director.

Following the time she met the Nanaks, Poirier testified that she went to the Public Records of Broward County, Florida, and performed her own independent title search on the property. She testified that this research was part of her routine before making an offer for real estate. She testified that she had performed similar searches before making offers before. In her research in Florida, Poirier learned that Jasmin Villa had been sold by the Nanaks for $925,000 in 1985, and that the Nanaks regained title to Jasmin Villa in 1987, after foreclosure of their purchase money mortgage from the 1985 sale. After her research and inspection of the earlier foreclosure file at the state courthouse, Poirier indicated to Blouin that because of Jasmin Villa's prior foreclosure, she would offer the Nanaks only the $925,000 that Jasmin Villa sold for in 1985, notwithstanding the $1,195,000 asking price, believing that the Nanaks would be happy to recoup that amount. The Nanaks rejected this offer. Poirier then executed a written offer to buy Jasmin Villa for $960,000, which the Nanaks also rejected, although they counterofferd to sell Jasmin Villa to Poirier for $1,050,000.

Before accepting the counteroffer, Poirier performed an additional level of analysis. Entered into evidence was her four page handwritten summary of projected profit and loss based on various hypothetical income levels, and various purchase money mortgage amounts and terms. She then determined, based on hypothetical income and expense numbers which she herself prepared, and not those that were listed on the copy of the Multiple Listing Ser-

vice profile that she received in the mail in Canada, that she could afford to purchase Jasmin Villa for $1,050,000. On Monday May 21, 1990, she took the four page projection and faxed it to her husband, Marcel Gravel, in Canada. Poirier testified that Gravel contacted her and agreed that the property could be bought for $1,050,000, if the Nanaks would take back a second mortgage for $499,000. Poirier therefore accepted the Nanaks' counteroffer of $1,050,-000, and agreed to execute a mortgage in that amount in favor of the Nanaks. The transaction closed on August 27, 1990. Although Poirier entered into the contract for purchase and sale in her own name, Poirier formed Poirier & Gravel Enterprises, Inc., the debtor, to take title to Jasmin Villa.

### Conclusions of Law

■ In Florida, relief for fraudulent misrepresentation against a seller may be granted only when all of the following elements are proven: (1) a false statement was made concerning a material fact; (2) the representor had knowledge that the representation is false; (3) the representor had an intention that the representation induce another to act on it; (4) the plaintiff actually relied on the representation; and (5) the plaintiff suffered consequent injury. *Johnson v. Davis*, 480 So.2d 625 (Fla.1985). As stated, the debtor alleged that there were two false statements concerning a material fact made to her, and both were on the copy of the Multiple Listing advertisement, namely that income for Jasmin Villa in the year prior to the listing was $210,000, and that the property has 29 rental units.

■ Without deciding whether the disclaimer on the listing that "information is believed to be accurate but not warranted" prevents a finding of misrepresentation of fact, on the ground that the listing, used to attract attention, is merely the broker's good faith opinion designed to attract preliminary interest, for there to be liability, the court must find that the debtor proved actual reliance on the listing and that it suffered damage. Where there is no damage, there is no liability for misrepresenta-

tion or fraud. *Empire Fire & Marine Ins. Co. v. Black*, 546 So.2d 732 (Fla.3rd DCA1989).

*Income.* The debtor did not immediately open the property for business after closing in August, 1990. Although there was some dispute whether the property was open at all until November 15, 1990, Poirier acknowledged that she was refurnishing some rooms of the motel during the first few months of ownership, thereby taking some rooms out of operation. Nanak introduced the debtor's tax return for 1990, which showed $51,000 in income, which Poirier did not deny. If the property operated for a quarter of 1990, the annualized income would be more than the $210,000 which was listed in the Multiple Listing Book.

During 1991, the debtor operated the property for approximately 10 months. Jasmin Villa was closed in May and June, 1991, and opened again in early July. John Gregalis, who operates the adjacent Ronnie D' Motel, testified that because of the Persian Gulf War, tourism to South Florida, and in particular to the Pompano Beach area where Jasmin Villa is located, was negatively impacted in 1991. According to the debtor's tax return for 1991, which, again, Poirier argued with, Jasmin Villa had revenues of $159,000 for its 9–½ to 10 months of operation, annualizing to an amount somewhat in line with the lessened income which Gregalis testified to, relative to the debtor's initial operations, and relative to a $210,000 per annum income level.

The debtor did not offer any income evidence for 1992, but the debtor in possession reports, introduced by the Nanaks, show that the debtor in possession's annualized income was in excess of $240,000.

Poirier argues that even if the debtor's income level approximated or exceeded what was contained in the Multiple Listing Service description for Jasmin Villa, the Nanaks misrepresented past income, and that the debtor is therefore entitled to damages. Louis Nanak testified that during 1989, Jasmin Villa experienced only $118,-000 in income. This was at variance with the amount showed in the listing which

Blouin had prepared and mailed to Poirier. Louis testified, and Blouin agreed, that the Nanaks did not give Blouin any information regarding the operation of the property, because the property had not been operating at full capacity. In late 1987, when the Nanaks retook possession of Jasmin Villa after foreclosure, the property had been severely damaged by the owner and was in the process of being rehabilitated. For the two year period 1988 and 1989, numerous rooms were out of service, thereby accounting for diminished income. When Blouin took the listing in November 1989, he was instructed by Louis to consult with the state court receiver for actual levels of income and expenses. Blouin indicated that he consulted with the prior receiver, and estimated some of the figures. Thus, although the Nanaks' actual income for 1989 was $118,000, the listing indicated that the property operated with a $210,000 annual rate of income. The last year that the Nanaks operated the property at full capacity, 1984, Jasmin Villa's income was $144,000. Louis Nanak testified that room rental rates increased between 1984 and 1990.

█ *Zoning.* In its complaint, the debtor alleged that the property, although represented to have 29 rental units in the listing, actually was permitted to only have 24 rental units in the City of Pompano Beach, because no building permit had been issued for more than that number of units. To prove the claim that the property had less than 29 units, the debtor produced two officials from the City of Pompano Beach. One, the City of Pompano Beach Building Official, testified that in his review of the records, he found building permits for 27 units, not 24, and because the property was built in the 1950s when City record keeping was not perfect, and numerous additions to the property took place in that period, he could not state for sure that there were no other building permits issued; he could only state with certainty that he was unaware of any others. He did state that operating the property for 29 units would not be a violation if the property had been properly built and had been used as 29 units from before the present

zoning code (i.e. if it was grandfathered in), and or if the owner applied for and obtained "after the fact" building permits. Interestingly, just before the case was first scheduled to go to trial, to try to prove its point, the debtor called in the City of Pompano Beach zoning department seeking to have the zoning official confirm that a violation existed, since the City had never cited the property and in fact, according to the evidence, had always issued annual occupational licenses for 29 units. Although the zoning inspector did, in fact, write up a violation, as of the time of trial, no hearing was held on the zoning citation, and the debtor was unaware of what defense would be offered. The debtor did indicate that since its acquisition of the property, through and including the trial, the property was always licensed for, and rented out as, 29 units, and would continue to be operated that way. Louis Nanak testified and offered photographs to show that the property qualified for grandfathering, and after the fact building permits, because the property had been used as 29 units before the present zoning. Nanak testified that he never heard of the debtor's claim that the property could not be used for 29 units until he was sued, and was not given a chance to help the debtor prove non-conforming use, or to otherwise qualify the two units for which there was no permit found. Moreover, Nanaks' evidence that the property should be grandfathered, according to the standards indicated by the Building official, was never contradicted by the debtor. The Court holds that debtor failed to carry the burden of proof that the property could not be used as 29 units. The debtor only proved that it was successful in having a violation written up and that it had made no attempt to obtain the paperwork to remedy the situation.

█ *Damage.* If damage is measured by the property's performance, Poirier was not harmed. If Poirier wanted a property that did $210,000 in annual income, she certainly did get one, even though the Nanaks themselves did not receive that much the year before they listed the property. Poirier argued that she suffered damage

because damage is measured by the difference between what she paid for Jasmin Villa, $1,050,000, and the actual value of what she received, in August, 1990. To prove her damages, she offered the testimony of an appraiser, as did the Nanaks.

The Nanaks' appraiser, John Dorsey, prepared a written appraisal report, and testified at trial. In his report, Dorsey delineated three approaches to value: comparable sales, cost, and income. For the 15 months prior to the closing of Jasmin Villa, that is, from May, 1989 through July, 1990, Dorsey located six comparable sales of motel property in the Pompano Beach area. Dorsey testified that a common method of comparing motel properties sales is to compare sale prices per rental unit, of similar properties in the same vicinity. In arriving at an estimate of value for Jasmin Villa, Dorsey adjusted values somewhat to account for differences in proximity to the ocean, amenities, and other aspects of each of the comparable properties. The six comparable sales which he found, on a per unit basis, were for $37,500, $39,040, $39,188, $36,400, $42,583 and $38,636. The debtor paid $36,200 per unit which Dorsey testified was at or below market value for a property of the condition, kind and location of Jasmin Villa. Dorsey also prepared a cost analysis, subtracting depreciation, and by that method also estimated the value of Jasmin Villa in August 1990 at an amount greater than the purchase price paid by the debtor. Finally, Dorsey testified that it was impossible to prepare a truly accurate estimate of value based on actual income, because the Nanaks had been operating the property at limited capacity during the two year rehabilitation period. However, based upon national averages for expense ratios, and local revenue experience, he performed an analysis and expressed the opinion that the property, in August 1990, was worth more than the $1,050,000 the debtor paid, utilizing the income approach.

The debtor's appraiser agreed that the comparable sales identified by John Dorsey were "in line" with the debtor's purchase price. However, he opined that the comparable sales approach to appraising income property is unreliable. He expressed the opinion that the only approach to value that he could consider in this case was based upon capitalizing the Nanaks' 1989 income tax return. Thus, he testified that based on the $118,000 found in the Nanaks' 1989 income tax return, the value of Jasmin Villa was approximately $650,000. He conceded, however, that if the property actually experienced $210,000 in sales, then the property would be worth $1.1 million. At the present time, the debtor's appraiser indicated that the property is worth more than $1.3 million, because of the $240,000 annualized income that the debtor in possession was receiving. He accounted for a jump in value of more than 100% in two and a half years not because of damages in land or property values, operations or improvements, but based upon the difference between the Nanaks' rehabilitation year income, and the debtor's post-rehabilitation income. He dismissed John Dorsey's appraisal of the land alone as being worth $405,000. He dismissed, on cross examination, any possibility that his capitalization approach to tax return information should be adjusted, if a tax return reflected aberrational operating results, due, for example, to the Nanaks' testimony of a scaled down operation to accommodate rehabilitation, or the fact that Route A–1–A was torn up in front of the motel for much of the year before sale, while it was widened and improved, as Louis testified.

Over the years, the Court has reviewed hundreds of appraisals, and finds the debtor's appraiser's testimony is inconsistent with approaches to value employed by other professionals using standards for appraisal of income property recognized in the industry. The Court accepts Dorsey's appraisal that Jasmin Villa was worth at least the amount that the debtor paid for it. Thus, neither Poirier nor the debtor proved that they suffered any damage. Since damage is an element of liability for fraud or misrepresentation, the debtor's failure to prove the damage requires a finding in favor of the defendants on this count.

■ *Reliance.* Additionally, the debtor failed to carry it burden with respect to the element of actual reliance on the informa-

tion in the Multiple Listing photocopy. Poirier never asked the Nanaks about the information on the listing, and she testified that the Nanaks told her nothing. She neither asked for, nor saw, any of the Nanaks' past income tax returns. Poirier did her own motel market survey, and courthouse records examination, and spent weeks with brokers looking at numerous properties to obtain an idea of value. Both the handwritten sheet which she and Blouin prepared, and the four pages of calculations which she independently prepared and faxed to her husband, demonstrate that at about the time she accepted the Nanaks' $1,050,000 counteroffer, the numbers she considered relevant were different from the numbers mailed to her weeks before. In short, it is clear that Poirier's judgment of whether to make an offer on this property, and the amount to offer, were determined by input other than the photocopy received in the mail.

In sum, it is clear that the debtor did not rely and in any event has suffered no damages. Thus, the claims for fraud and deceit and breach of contract are not actionable. Moreover, because there was no fraud, rescission and cancellation of the purchase money mortgage and note is not available. Similarly, the debtor has failed to demonstrate that it was injured, and its claim for civil theft must also fail. Finally, because the count against the broker and salesman is predicated upon damages having been suffered, and since none was shown, the debtor cannot prevail on that count either.

Accordingly, the Court finds for the Defendants on all Counts in the Complaint. The Nanaks secured claim shall be allowed in full.

DONE AND ORDERED.